*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

NICHOLAS GRAY WILLIAMS,

Defendant-Appellant.

UNPUBLISHED
August 11, 2026
9:27 AM

No. 370533
Berrien Circuit Court
LC No. 2022-003733-FH

Before: BOONSTRA, P.J., and YOUNG and KOROBKIN, JJ.

PER CURIAM.

Defendant, Nicholas Gray Willams, appeals by right his jury-trial convictions of first-degree home invasion, MCL 750.110a(2); assault with intent to commit great bodily harm less than murder (AWIGBH), MCL 750.84; and felonious assault, MCL 750.82. The trial court sentenced defendant to 100 to 240 months' imprisonment for the home-invasion conviction, 50 months to 10 years' imprisonment for the AWIGBH conviction, and 84 days in jail for the felonious-assault conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On November 2, 2022, Brandon Rigler talked to and exchanged text messages with his former girlfriend, Tierrah Adams. As a favor to Adams, Rigler agreed to make some drywall repairs and do some painting and plumbing at her home in Berrien County. Rigler and Adams had broken up shortly before November 2022, partly because, after finding certain text messages on Adams's phone, Rigler suspected that Adams was cheating on him with defendant. Defendant lived with his father, Walter Williams, in the same mobile-home community as Adams, and codefendant Christopher Alan Rice[1] lived next door to defendant. Although Adams maintained

---

[1] Codefendant Rice was tried with defendant and was convicted of first-degree home invasion and AWIGBH. Rice separately appealed his convictions in *People v Rice*, unpublished per curiam opinion of the Court of Appeals, issued August 11,2026 (Docket No. 367258).

that she and defendant were only friends in November 2022, they were engaged at the time of trial in May 2023.

Rigler arrived at Adams's home with his son, his dog, and a trailer full of tools and materials at about 8:00 p.m. on November 2, 2022. Adams and her children were spending the night with her mother, Charlene Brumley, at Brumley's home in Berrien Township. Rigler maintained that Adams left the entry door of her home unlocked, left a spare key for him on a counter, and agreed that Rigler could spend the night at her home to complete the work. Rigler unloaded his trailer and put most of his tools and materials inside Adams's home but left some drywall panels and lumber outside. Rigler sent Adams a text message stating that he planned to take his son out to eat and drop him off at his mother's house, and then Rigler would return to her home to "start working." After dropping off his son, Rigler also stopped at Walmart to buy some additional supplies.

When Rigler returned to Adams's home, he noticed that someone had moved a safety cone from the front of his trailer to the top of the trailer. Rigler was annoyed, thinking that defendant may have moved the cone, so Rigler texted Adams about it and asked her to check the Ring security camera on her porch to see who had moved it. Rigler left his dog in a kennel inside his vehicle, then he went inside the home and cleaned and prepared drywall in two bedrooms and a bathroom. After he turned off a vacuum in one of the bedrooms, Rigler heard a noise near the entry door of the home. Rigler went to the door and saw that a man—later identified as defendant—wearing a hood and a mask fashioned from a bandana had opened both the storm door and the entry door and was stepping inside the home. Rigler tried to push defendant back through the doors, but another masked man—later identified as codefendant Rice—was rushing up the stairs behind defendant, and they both pushed Rigler back inside the home.

Defendant and Rice immediately began to punch Rigler. Rigler repeatedly tried to get away from the men, but they continued to attack him. At one point, Rigler fell to one knee, and one of the men tried to choke Rigler from behind. Rigler saw that Rice had something in his hand that appeared to be made out of shiny metal, and Rigler thought it might be a "fist pack" or fist-load weapon to make his punches heavier. Defendant pulled out a knife during the assault and began to make slashing motions toward Rigler while saying "I have a knife. Imma cut you."

Rigler picked up a kitchen barstool to fend off the attackers, but defendant grabbed it and pulled it away, and Rigler then tried to retreat to one of the bedrooms. Defendant and Rice followed Rigler and prevented him from closing the bedroom door. During the assault, Rigler recognized the men as defendant and Rice because their masks fell down or were pulled down, he had met both men before, he recognized defendant's blue Nike shoes, and he recognized Rice's high-pitched voice and distinctive nose. Rigler also recalled that, during the attack, Rice told him to stay away from Adams and her children, and defendant said that he knew Rigler, knew his child's name, and knew the name of his child's mother.

In the bedroom, defendant and Rice continued to punch Rigler in the face and body, and Rigler also felt them hit and kick him in the back. Rigler felt his jaw break, and, while taking a step backward, Rigler stepped into a pile of clothes and broke his ankle. After that, the men headed back toward the entry door of the home.

When both men were gone, Rigler could not find his phone to call for help. He wanted to get to the hospital because he needed medical attention, and he called out from the porch hoping that a neighbor would hear him and call 911, but he was unsuccessful. While walking on his broken ankle, Rigler tried to gather his tools and materials and pack them back into his truck and trailer, but he left the drywall and lumber outside Adams's home. As he left, Rigler noticed that Adams's security camera was missing from her porch.

Because Rigler's eye was swelling shut and he was having trouble swallowing and breathing, Rigler drove down Shawnee Road to Brumley's home to ask Adams for a ride to the hospital. When Adams answered the door, Rigler asked her to take him to the hospital and to call his cell phone because he could not locate it. According to Rigler, Adams said that she would get her things to take him to the hospital, but instead she closed and locked the door. Brumley then came to the door and told Rigler to get off her property and that she was calling the police.

After receiving no help from Adams, Rigler suspected that Adams had arranged for defendant and Rice to attack him. Rigler was concerned about his dog because he thought that he might need to stay in the hospital, so he drove to an apartment complex in Buchanan. He had friends who lived in the complex, one of whom helped him put out food and water for his dog and called Rigler's cell phone, which they discovered had fallen between the seats in Rigler's vehicle. Rigler's friend then drove him to the hospital.

Rigler remained in the hospital for three days. He had surgery on his jaw because it was broken in two places and had to be repaired with titanium plates and screws. Rigler's nasal bone and the bone around his left eye were also broken. According to Rigler, he was on a liquid diet for weeks and had to be treated for an infection in his jaw following surgery. Rigler also sustained broken teeth, and he wore a cast on his foot and ankle for a "couple months."

Berrien County Sheriff's Deputy Benjamin Eberly investigated the case after Brumley called 911 and reported that Rigler had tried to enter her house without permission. Deputy Eberly issued a "be on the lookout" message for law enforcement to find Rigler, and he learned that Rigler was in the hospital. After speaking with Rigler at the hospital, Deputy Eberly noted his serious injuries and learned from Rigler that defendant and another man (whose name he did not know) had assaulted him. According to Deputy Eberly, this interview changed the focus of his investigation because it appeared that Rigler had gone to Brumley's home to ask for help. During a phone call later that day, Rigler identified Rice as his other attacker and told Deputy Eberly that Rice lived next door to defendant.

Following an investigation, police arrested defendant and Rice in December 2022, and the trial court later granted the prosecutor's motion for joint trial. At trial, Adams denied that she had planned the attack on Rigler. She also denied giving Rigler, defendant, or Rice permission to enter her home, but she later admitted that her text exchanges with Rigler suggested that he planned to do construction work inside her home that night. She also testified that on the morning after the attack, it appeared that someone had vacuumed one of the rooms, and she also found blood in the home. Among other witnesses, the prosecutor called Walter (defendant's father), who testified that defendant and Rice were listening to music on his porch on the evening of the attack on Rigler. But he also admitted that he could not account for defendant's and Rice's whereabouts for about

an hour and a half between the time that he went to bed and when he woke up shortly after 1:30 a.m.

The jury found defendant guilty of first-degree home invasion, AWIGBH, and felonious assault. The trial court sentenced him as described, and this appeal followed.

## II. *BRADY* VIOLATION

Defendant argues that the prosecution violated *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), and its progeny because law enforcement did not conduct an adequate investigation of the crimes (which might have revealed exonerating evidence). We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

Defendant concedes that he did not raise this argument in the trial court, so the issue is not preserved for appellate review. See *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). "Unpreserved claims of constitutional error are reviewed for plain error." *People v McNally*, 470 Mich 1, 5; 679 NW2d 301 (2004) (quotation marks and citation omitted). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To establish that a clear error affected a defendant's substantial rights, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks, citation, and alteration omitted).

### B. ANALYSIS

A defendant's due-process rights are violated if the prosecution suppresses evidence in the government's possession that is favorable to the defendant and material to the defendant's guilt or punishment. *Brady*, 373 US at 87. To establish a *Brady* violation, a defendant must show that (1) the prosecution failed to produce evidence within the government's control, (2) the evidence was exculpatory or impeaching, and (3) had the evidence been disclosed, there was a reasonable probability that the result of the proceeding would have been different. *People v Chenault*, 495 Mich 142, 150-151; 845 NW2d 731 (2014). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id*. at 150 (quotation marks and citation omitted).

Defendant argues that Deputy Eberly was required to search for and analyze potentially exculpatory evidence that the prosecution was then required to turn over to defendant. In particular, he argues that Deputy Eberly's investigation was inadequate because he failed to sufficiently search Adams's home, collect DNA evidence from the crime scene, investigate the possibility of obtaining security footage from Adams's Ring camera, and investigate the authenticity of a photo of defendant's hands (which Walter had sent to show the absence of cuts or bruises). Defendant merely speculates—without support in the record—that those investigations could have produced exculpatory evidence. He has not shown that certain evidence

actually existed, nor has he explained how the evidence could have affected the outcome of his trial or sentencing.

Furthermore, *Brady* only addresses the suppression of evidence that is *already* in the government's control. See *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence *known* to the others acting on the government's behalf in the case, including the police.") (emphasis added). "For due process purposes, there is a crucial distinction between failing to disclose evidence that has been developed and failing to develop evidence in the first instance." *People v Anstey*, 476 Mich 436, 461; 719 NW2d 579 (2006). Indeed, "the police have no constitutional duty to assist a defendant in developing potentially exculpatory evidence." *Id*. Defendant does not allege that the prosecution failed to disclose the results of Deputy Eberly's actual investigation; he only alleges that the investigation itself was inadequate. But without any proof that the government actually possessed material exculpatory or impeaching evidence that the prosecution failed to disclose, defendant has not shown a *Brady* violation.[2] See *Chenault*, 495 Mich at 150-151. Accordingly, we find no plain error requiring reversal. See *Carines*, 460 Mich at 763.

### III. PROSECUTORIAL MISCONDUCT

Defendant argues that the prosecutor committed misconduct by asking Deputy Eberly to draw a legal conclusion during his testimony. Again, we disagree.

"To preserve a claim of prosecutorial error, a defendant must timely and specifically challenge the prosecutor's statements or conduct." *People v Thurmond*, 348 Mich App 715, 735; 20 NW3d 311 (2023).[3] Defendant did not object to the prosecutor's questions in the trial court, so this claim is not preserved, and we review it for plain error affecting substantial rights. See *id*.

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Generally, prosecutors are accorded great latitude regarding their arguments and conduct." *People v Serges*, 351 Mich App 88, 126; 34 NW3d 550 (2024) (quotation marks and citation omitted). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate

---

[2] Because the investigation in this case did not result in a *Brady* violation, defendant's argument that his counsel was ineffective for failing to "object to the absence of any meaningful investigation" necessarily fails. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

[3] The term "prosecutorial misconduct" is sometimes more appropriately described as "prosecutorial error." See, e.g., *Thurmond*, 348 Mich App at 735 n 6; *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). Nevertheless, because "misconduct" is the term of art traditionally used, we use that term in this discussion, unless quoting.

a prosecutor's remarks in context." *Dobek*, 274 Mich App at 64. We also review a prosecutor's conduct in light of the evidence and whether they address issues raised by defense counsel. *Id*.

Defendant argues that the prosecutor elicited testimony from Deputy Eberly in a manner that asked for a legal conclusion in violation of MRE 701.[4] MRE 701 governs the admission of lay opinion testimony and, at the time defendant was tried, it provided as follows:

> If the witness is not testifying as an expert, the witness' [sic] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

But generally, "courts will not permit even expert witness testimony on a question of domestic law because it is the exclusive responsibility of the trial judge to find and interpret the applicable law." *People v Lyons*, 93 Mich App 35, 46; 285 NW2d 788 (1979). Because defendant bases his prosecutorial misconduct argument on a rule of evidence, we consider whether the prosecutor elicited the disputed testimony in good faith. See *Dobek*, 274 Mich App at 70-71.

Rice's defense counsel elicited testimony from Deputy Eberly during cross-examination about whether he was able to get a search warrant for Ring video footage and whether he had drafted or obtained a search warrant for the weapons that Rigler had described. On redirect examination, the prosecutor asked Deputy Eberly several questions about his understanding of search warrants. In response, Deputy Eberly testified that to get a search warrant, the police needed probable cause and needed to know specific information about what they were looking for and where the items were located. He also explained that the purpose of a search warrant was "to go in and search for items of a crime," and that warrants were required for the Fourth Amendment, which he summarized as "Everybody has the right to search and seizure, []legal[5] search and seizure." The prosecutor asked Deputy Eberly if there was enough information to obtain a search warrant, and Deputy Eberly responded that there was not.

Contrary to defendant's assertion, the prosecutor did not elicit inadmissible legal conclusions from Deputy Eberly. In accordance with MRE 701, Deputy Eberly's testimony that he did not have the information required to obtain a search warrant was rationally based on his experience in law enforcement and the results of his investigation. The testimony was also helpful the determination of a fact at issue: the adequacy of the investigation. Rice's defense counsel had elicited testimony that Deputy Eberly never obtained any search warrants in this case, which might imply poor investigative work and the possibility that the police overlooked important evidence. The prosecutor's questioning elicited testimony that tended to dispel that theory. Deputy Eberly

---

[4] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of trial.

[5] The transcript uses the word "illegal," which appears to be a typographical error; based on the testimony, it appears that Deputy Eberly said or intended to say "*a legal* search and seizure."

chose not to request a search warrant not because he was rushing to arrest defendant and Rice, but because he was following a standard procedure intended to protect defendant's rights.

Furthermore, the fact that Deputy Eberly's testimony included some incidental statements about his understanding of the law did not render the testimony inadmissible. Unlike in *Lyons*, 93 Mich App at 47, in which an expert witness provided a legal interpretation of a statute that conflicted with the jury instructions and confused the jury, Deputy Eberly's lay testimony about search warrants had no impact on defendant's guilt. This case involved no dispute about the constitutionality of searches or seizures, the validity of a search warrant, or the proper application of the Fourth Amendment, so his testimony did not conflict with the trial judge's responsibility to find and interpret the applicable law. See *id*. at 46. In any event, the fact that Fourth Amendment issues were not relevant in this trial and that the testimony presented helpful context for understanding Deputy Eberly's earlier statements shows that the prosecutor acted in good faith by eliciting the testimony. See *Dobek*, 274 Mich App at 70-71. Accordingly, defendant has not shown plain error requiring reversal. See *Thurmond*, 348 Mich App at 735.[6]

Affirmed.

/s/ Mark T. Boonstra
/s/ Adrienne N. Young
/s/ Daniel S. Korobkin

---

[6] Defendant argues in the alternative that defense counsel was ineffective for failing to object to the prosecutor's questions. Because we hold that the testimony was admissible, we also hold that defense counsel was not ineffective for failing to object to its admission. See *Ericksen*, 288 Mich App at 201.